[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Morris v. Stark Cty. Bd. of Elections,* Slip Opinion No. 2015-Ohio-3659.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-3659

THE STATE EX REL. MORRIS ET AL. *v.* STARK COUNTY BOARD

OF ELECTIONS ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Morris v. Stark Cty. Bd. of Elections,* Slip Opinion No. 2015-Ohio-3659.]

*Elections—Prohibition—Residency—R.C.3503.02—Focus of residency inquiry is on what candidate knew and intended on the day the statement of candidacy was filed—No subsection of R.C.3503.02 trumps any other— Disaffiliation from political party—R.C. 3513.257—Incumbent who was elected as a member of a political party need not resign from current office in order to run for a different office as an independent—Candidate established residence in election district and completely disaffiliated from party prior to filing statement of candidacy as independent—Writ denied.*

(No. 2015-1277—Submitted September 2, 2015—Decided September 9, 2015.)

IN PROHIBITION.

_____

**Per Curiam.**

{¶ 1} This is an expedited election case in which the relators seek a writ of prohibition to prevent respondents, Secretary of State Jon Husted and the Stark County Board of Elections, from placing the name of intervening respondent, Thomas M. Bernabei, on the November 2015 ballot as an independent candidate for mayor of Canton. We deny the writ.

*Background*

{¶ 2} Tom Bernabei has a history as a member of the Democratic Party stretching back 40 years. Most recently, Bernabei, running as a Democrat, won a four-year term on the Stark County Board of Commissioners in November 2012.

{¶ 3} Bernabei gave no thought to running in the mayoral primary because at the time, in his words, his focus was on county government. But, he testified, two incidents galvanized his decision to run for mayor as an independent. On Wednesday, April 22, 2015, there was a debate between the two Democratic mayoral candidates. Bernabei, who listened on the radio, described himself as "disillusioned by the nature, quality, and responses [sic] of both candidates." Bernabei perceived a failure of the two-party system: the Democratic Party failed to provide a quality candidate, and the Republican Party did not field a candidate at all.

{¶ 4} The second galvanizing event occurred the following Sunday, April 26. That morning, the Canton Repository published an editorial in which it criticized the two candidates, refused to endorse either one, and called for an independent to enter the race.

{¶ 5} Bernabei and his wife were scheduled to fly to Clearwater Beach, Florida, for a prearranged vacation, departing the evening of Thursday, April 30, and returning the evening of Sunday, May 3. Before he left, Bernabei took steps to lay the groundwork for an independent campaign.

{¶ 6} The day after the Repository editorial, Bernabei contacted an elections-law lawyer, Donald McTigue, seeking information about how to become an independent. He also spoke with "various friends and advisors," including Phil Giavasis, chairman of the Stark County Democratic Party, about the step he was contemplating.

{¶ 7} From his conversation with McTigue, Bernabei understood that he needed to obtain a residence in the city of Canton. At the time, Bernabei and his wife resided outside the city, in Jackson Township, at a home on Dunkeith Drive (the "Hills & Dales" house). Bernabei and his wife owned a house in Canton (the "Lakecrest" house), in which they had not lived since 2004. The house was leased to a doctor and his family. In early April, the doctor's family had informed Bernabei that they planned to move because they needed a larger house. They anticipated closing on a new house sometime around the end of April, but could not identify an exact date.

{¶ 8} As of the last week of April, Bernabei still did not know when the family would move out. On Tuesday, April 28, he asked the doctor's wife if he could live in the house, perhaps in a back bedroom, starting Wednesday night, for purposes of running for office. She said no.

{¶ 9} So Bernabei turned to a friend who owned a vacant house in Canton (the "University Avenue" house). On Thursday, April 30, 2015, Bernabei signed a lease commencing May 1, 2015, with an initial term of one month, renewable on a month-to-month basis. Bernabei paid his friend $1,000 for the May rent. He also delivered a separate check for a security deposit, which was never cashed, and he received a garage-door opener and security codes at the time he signed the lease.

{¶ 10} Around noon on Thursday, April 30, Bernabei met with Jeanette Mullane, deputy director of the county board of elections. One purpose of the meeting was to complete a change-of-address form, switching his voting address

from Hills & Dales to the University Avenue house. Bernabei testified that he was at that point leaning toward disaffiliation but had yet to reach a final decision. Therefore, he postdated the form for May 3 and told Mullane that he would instruct her whether or not to file the form once he reached a final decision.

{¶ 11} Bernabei also arranged the meeting with Mullane for the purpose of handing to her four resignation letters: one from the Democratic Party Central Committee and one each from the Democratic clubs in Canton, Massillon, and Alliance. He asked Mullane to hold the letters and, if he decided to run as an independent, to deliver the letters to Democratic Party Chairman Giavasis. She agreed to do so.

{¶ 12} Thus, Bernabei was able to testify without contradiction that he had resigned from the Democratic Party Central Committee. And the relators concede that he effectively resigned from one of the clubs. But representatives from the Alliance Area Democratic Club and the Jefferson-Jackson Democratic Club testified that they never received a letter of resignation from Bernabei.

{¶ 13} Bernabei reached his final decision to run for mayor on Saturday, May 2, 2015, while still in Clearwater Beach. He called Mullane and told her to file the change-of-address form. He then asked his wife to change their plane reservations so they could return to Canton as early as possible. They flew back on Sunday morning, and Bernabei set to work drafting his nominating petition and contacting possible circulators.

{¶ 14} On Sunday night, he moved into the University Avenue house. He took with him a bunk bed (with frame, mattress, sheets, blankets, and pillows), a lamp, a lounge chair, two books, three or four suits with ties, three or four dress shirts, dress shoes, a belt, socks, underwear, blue jeans, shorts, t-shirts, a sweatshirt, tennis shoes, a razor, shampoo, a toothbrush and toothpaste, towels, a card table with one or two folding chairs, an iPod/phone charger, a laptop and printer, bananas, milk, Cheerios, Diet Pepsi, rum, vitamins, Metamucil, Lipitor,

4

Aspirin, Advil, a large duffel bag, plastic cups, and trash bags. Judge Richard Reinbold visited the University Avenue house and subsequently testified that "it was obvious that he was in that place to live." He reported seeing signs of habitation in the kitchen, bedroom, bathroom, and garage, including a bed, clothing, a toothbrush, brushes, and kitchen implements.

{¶ 15} Bernabei slept in the University Avenue house for four consecutive nights, from Sunday, May 3, through Wednesday, May 6. On May 6, his tenant, the doctor, surrendered possession of the Lakecrest house, and Bernabei slept at Lakecrest for the first time on the night of May 7, 2015. On May 15, 2015, Bernabei executed a second change-of-address form, now designating the Lakecrest house as his permanent voting location. During his time in the University Avenue house, Bernabei's wife did not move there. On primary day, she voted in the Hills & Dales precinct. She moved straight from Hills & Dales to Lakecrest.

{¶ 16} Bernabei voted a provisional ballot at the board of elections on May 4, 2015, using the University Avenue address. That same day, he resigned as treasurer for three Democratic campaigns and filed his statement of candidacy and nominating petitions.

*Procedural history*

{¶ 17} On May 29, 2015, Frank Morris and eight other protesters (hereafter, collectively, "Morris") filed a protest against Bernabei's candidacy with the Stark County Board of Elections. The board conducted a protest hearing on July 6, 2015, at the end of which the members deadlocked two-to-two on the protest. On July 31, 2015, Secretary of State Husted broke the tie in favor of certifying Bernabei's independent candidacy for the November ballot.

{¶ 18} On August 4, Morris filed the present suit for a writ of prohibition. The court granted Bernabei leave to intervene, and the case is fully briefed.

*Standard of review*

{¶ 19} To prevail in their protest, the protesters had to prove by clear and convincing evidence that Bernabei's declaration was not made in good faith. *See State ex rel. Monroe v. Mahoning Cty. Bd. of Elections*, 137 Ohio St.3d 62, 2013-Ohio-4490, 997 N.E.2d 524, ¶ 25. And in an extraordinary-writ action challenging a decision of the secretary of state, the standard is whether the secretary of state engaged in fraud or corruption, abused his discretion, or acted in clear disregard of applicable law. *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Brunner*, 125 Ohio St.3d 427, 2010-Ohio-1873, 928 N.E.2d 1072, ¶ 9.

{¶ 20} Morris objects to Bernabei's candidacy on two grounds: (1) Bernabei was allegedly not a genuine resident of Canton on the date he filed his nominating petitions and (2) he did not actually disaffiliate from the Democratic Party before filing his petitions, which would necessarily mean that his declaration was not made in good faith. Subsumed in the second objection is a question of first impression in Ohio: whether a prospective candidate who is an incumbent officeholder as a Democrat or Republican must resign his office in order to run for a different office as an independent.

*Residency*

{¶ 21} In his tie-breaking letter, Secretary of State Husted rejected Morris's claim that Bernabei failed to establish a qualified voting residence in Canton, citing evidence that Bernabei submitted a voter-registration update form, signed a lease for the University Avenue house, moved belongings into the house, and slept there.[1] Husted considered it "of little significance" that Bernabei later moved into a different home in Canton, one that was unavailable for occupancy when he signed the lease. "The Ohio Supreme Court has noted that a 'person's

_____

[1] Husted erroneously refers to the University Avenue house as an apartment. The lease identifies 2118 University Avenue, N.W., as a "single family residence."

6

intent is of great import,' " he stated, "and no evidence in the record before me imparts a firm belief or conviction that Mr. Bernabei's actions exhibited anything but an intent to reside in the city of Canton." Morris calls this decision an abuse of discretion.

{¶ 22} Every candidate is required to swear, under penalty of election falsification, that he or she is "an elector qualified to vote for the office I seek." R.C. 3513.261. To be qualified to vote for the office, the prospective candidate must be registered to vote at an address within the election district at the time he or she signs the statement. *State ex rel. Walsh v. Ashtabula Cty. Bd. of Elections*, 65 Ohio St.3d 197, 203-204, 602 N.E.2d 638 (1992).

{¶ 23} In election cases involving candidate-residence issues, this court applies R.C. 3503.02. *State ex rel. Stine v. Brown Cty. Bd. of Elections*, 101 Ohio St.3d 252, 2004-Ohio-771, 804 N.E.2d 415, ¶ 15. According to R.C. 3503.02(A), "[t]hat place shall be considered the residence of a person in which the person's habitation is fixed and to which, whenever the person is absent, the person has the intention of returning." The statute " 'emphasizes the person's intent to make a fixed or permanent place of abode.' " *State ex rel. Ross v. Crawford Cty. Bd. of Elections*, 125 Ohio St.3d 438, 2010-Ohio-2167, 928 N.E.2d 1082, ¶ 37, quoting *State ex rel. Duncan v. Portage Cty. Bd. of Elections*, 115 Ohio St.3d 405, 2007-Ohio-5346, 875 N.E.2d 578, ¶ 11.

{¶ 24} According to Morris, the University Avenue house was not Bernabei's "residence" on May 4, 2015, because it was neither fixed nor permanent and because he had no intent to make it his permanent abode. Morris contends that the attempt to claim University Avenue as a residence was a sham because Bernabei did not intend to live at that address permanently; by his own admission, he intended to move to Lakecrest whenever that house became available.

**{¶ 25}** The record is clear that while Bernabei did not intend to reside in the University Avenue house forever, he *did* intend to reside there indefinitely. He did not know, when he signed the lease or when he filed his petition, how long he would have to reside there before the Lakecrest house became available. This case is therefore easily distinguishable from one in which a candidate or circulator attempts to list a hotel room as a residence.

**{¶ 26}** Alternatively, Morris cites R.C. 3503.02(D): "The place where the family of a married person resides shall be considered to be the person's place of residence." Because Bernabei's wife remained at Hills & Dales, Morris argues that Bernabei's residence remained Hills & Dales. The flaw in this argument is Morris's assumption that one clause in R.C. 3503.02—subsection (D)—trumps another—subsection (A). To the contrary, "when the applicability of multiple sections [of R.C. 3503.02] leads to conflicting results, it cannot be shown by the heightened standard of clear and convincing evidence that the person is not a resident of that county, and great weight must be accorded to the person's claimed voting residence." *State ex rel. Husted v. Brunner*, 123 Ohio St.3d 288, 2009-Ohio-5327, 915 N.E.2d 1215, ¶ 27.

**{¶ 27}** We recognize that Bernabei's case may test the limits of what can constitute a residence, given that as events unfolded, he only spent a few nights at University Avenue. But the inquiry focuses on what he knew and intended on the day he filed his candidacy declaration, not on what happened later.

**{¶ 28}** We hold that Secretary of State Husted did not abuse his discretion when he concluded that Bernabei established a conforming residence. Given this result, we do not address the alternative argument, raised by Bernabei's counsel, that the "place" of residence in R.C. 3503.02(A) refers to the *jurisdiction* where the person resides. Based on the foregoing, we hold that Morris is not entitled to a writ of prohibition based on an alleged residency defect.

*Disaffiliation*

{¶ 29} A candidate who wishes to run as an independent must file a statement of candidacy and nominating petitions with the board of elections no later than 4:00 p.m. on the day before the primary. R.C. 3513.257. Implicit in the submission of these documents is the candidate's declaration that he or she is independent; that declaration must be made in good faith. *State ex rel. Davis v. Summit Cty. Bd. of Elections*, 137 Ohio St.3d 222, 2013-Ohio-4616, 998 N.E.2d 1093, ¶ 17, 28; *Morrison v. Colley*, 467 F.3d 503, 509 (6th Cir.2006). Morris asserts that he presented clear and convincing evidence that Bernabei had not disaffiliated from the Democratic Party when he signed his statement of candidacy and that therefore the statement was not signed in good faith. We do not agree.

{¶ 30} The Sixth Circuit Court of Appeals has stated that a person wishing to run as an independent must first disaffiliate *completely*. *Jolivette v. Husted*, 694 F.3d 760, 768 (6th Cir.2012). Morris contends that, in order to completely disaffiliate, Bernabei had to resign his seat on the Stark County Board of Commissioners, to which he was elected as a Democrat. However, he cites no authority for the proposition that R.C. 3513.257 requires an incumbent who was elected as a member of a political party to resign from his or her current office in order to run for a different office as an independent.

{¶ 31} Bernabei's resignation from the county board of commissioners would signify disassociation from the county commissioners, not the Democratic Party. Unlike some offices (boards of elections, for example), the revised code does not assign seats on the county board of commissioners by political affiliation.

{¶ 32} When Bernabei became a candidate for the board of commissioners, he did sign an affirmation stating that if elected, he would "support and abide by the principles enunciated by the Democratic Party."

However, it is unclear what Morris considers the legal significance of this affirmation to be. On the one hand, he argues that Bernabei realized a benefit by associating himself with the Democratic Party and that he should not be able to retain that benefit, i.e., the office, when, as a self-declared independent, he can no longer support and abide by the principles of the Democratic Party. But Morris cannot seriously be suggesting that the affirmation created legally enforceable contract rights for the Democratic Party or Democratic voters. Under that theory, the party could seek judicial removal of any elected official who was deemed to have crossed party lines too often or deviated from party orthodoxy, a plainly absurd result.

{¶ 33} Alternatively, Morris points to R.C. 305.02(B), which, under certain circumstances, would permit the Democratic Party to appoint a temporary successor if Bernabei were to resign as a county commissioner. But Morris is mistaken in his assumption that the statute permits the party in whose name the official was elected to appoint his successor. Rather, the right of appointment belongs to the party with which the outgoing office holder was *affiliated*, R.C. 305.02(B), which does not necessarily mean the same thing as "elected as," *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 586, 651 N.E.2d 995 (1995) (interpreting comparable language in R.C. 733.08). Thus, there is no statutory support for the notion that the office in any sense belongs to the Democratic Party or that Bernabei must resign from office in order to disaffiliate from the Democratic Party.

{¶ 34} Morris's other examples of Bernabei's alleged ongoing affiliation with the Democratic Party do not constitute clear and convincing evidence that he remained a Democrat. The evidence in question includes Bernabei's continuing membership in two Democratic clubs and representations of Bernabei's affiliation with the party in radio ads for Democratic candidates and on campaign materials and websites, including the Stark County Democratic Party website.

**{¶ 35}** In making this argument, Morris misconstrues the facts of *Jolivette v. Husted*, the Sixth Circuit case that faulted the prospective independent candidate for not "completely" disaffiliating. Jolivette's problem was that after filing his petition, he continued to maintain a Facebook page that indicated he was affiliated with the Republican Party, kept on file a designation-of-treasurer form identifying himself as a Republican, and allowed his campaign committee to continue representing on its website that he would provide "Strong Republican Leadership." *Jolivette*, 694 F.3d at 767-768. These representations of party affiliation were all under Jolivette's control.

**{¶ 36}** By contrast, Bernabei recorded a campaign radio spot for Democrat Kristen Donohue Guardado before he decided to become an independent. Once the ad was finished, he had no control over when it aired and no authority to prohibit it from running. Bernabei likewise had no control over the content of the party website and in fact testified that he may not even have been aware that his picture was posted there. Finally, the evidence is clear that Bernabei took affirmative steps to resign from the three clubs. The record does not indicate why the letter was received by only one of the clubs, nor is there any evidence that Bernabei knew or should have known, prior to the protest hearing, that the letters were not received by two of the clubs.

**{¶ 37}** Morris also points to a response Bernabei gave at the protest hearing as an admission that he was not disaffiliated. When discussing his failure to ensure delivery of his resignation letters, Bernabei said that it was an

> [o]mission on my part to fail to mail them. Yes, I wish I had mailed them, obviously. I wish I had run in the Democratic primary. We wouldn't be here today. Neither of those things happened. I omitted to mail them. I did not intentionally chose [sic] not to mail them.

11

Morris says this response "establishes that [Bernabei] has not disaffiliated from the Democratic Party, but is running as an independent only because he had procrastinated in seeking his party's nomination." Although that interpretation may be plausible, Bernabei's remarks sounds more like a wistful expression of resignation that if he had only done things differently, he might not have had to suffer through the protest hearing. An ambiguous response is not clear and convincing evidence.

**{¶ 38}** Finally, Morris rests his case on Bernabei's long and active participation in Democratic Party politics. Such evidence is present, in greater or lesser degree, in every disaffiliation case because disaffiliation by definition presumes a history of support for or membership in a political party. *Davis*, 137 Ohio St.3d 222, 2013-Ohio-4616, 998 N.E.2d 1093, at ¶ 19. We have left open the theoretical possibility that a disaffiliation challenge could be based wholly on pre-petition evidence. However, we do not see how the length of a candidate's partisan political life is necessarily probative of whether the candidate has truly left the party.

**{¶ 39}** This court has long held that there is no abuse of discretion when a board of elections reaches a decision based on "substantial though conflicting evidence." *State ex rel. Clinard v. Greene Cty. Bd. of Elections*, 51 Ohio St.3d 87, 88, 554 N.E.2d 895 (1990). We hold that Morris has failed to demonstrate that he presented clear and convincing evidence on the disaffiliation question, that Husted abused his discretion, or that Husted acted in clear disregard of applicable law. We therefore deny the writ of prohibition.

Writ denied.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Tzangas Plakas Mannos, Ltd., and Lee E. Plakas; and Center for Constitutional Litigation, P.C., and Robert S. Peck, for relators Frank Morris, Chris Smith, Thomas E. West, Kevin Fisher, David R. Dougherty, John Mariol II, and Edmond J. Mack.

The Ohio Democratic Party and N. Zachary West, for relator Ohio Democratic Party.

John D. Ferrero, Stark County Prosecuting Attorney, and Deborah A. Dawson and Stephan P. Babik, Assistant Prosecuting Attorneys, for respondent Stark County Board of Elections.

Michael DeWine, Attorney General, and Sarah E. Pierce, Zachery P. Keller, and Nicole M. Koppitch, Assistant Attorneys General, for respondent Ohio Secretary of State Jon Husted.

Vasvari & Zimmerman, Raymond V. Vasvari Jr., and K. Ann Zimmerman, for intervening respondent Thomas M. Bernabei.

_____